**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JEFFREY ALLEN WATTS,**

      **Plaintiff,**

**v.**　　　　　　　　　　　　　　**Case No.: 3:15-cv-13094**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 9).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the

pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and this case be **DISMISSED** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On April 19, 2012, Plaintiff Jeffrey Allen Watts ("Claimant"), filed an application for DIB, alleging a disability onset date of August 1, 2006, due to "Left arm Amputation, Pain and cramping in right hand, Phantom pain, Carpal tunnel in right hand, Tendinitis in right elbow, Right shoulder problems, Sleeping problems, Lower back, Balance problems, [and] Neck pain."[1] (Tr. at 137, 176). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 68, 76). Claimant filed a request for an administrative hearing, (Tr. at 83), which was held on March 7, 2014, before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 26-47). By written decision dated March 26, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 13-21). The ALJ's decision became the final decision of the Commissioner on July 13, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, (ECF Nos. 5, 6), and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 9). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 39 years old at the time he filed the instant application for benefits,

---

[1] Claimant previously filed an application for DIB on April 5, 2010, alleging a disability onset date of January 1, 2007. (Tr. at 13). The application was "technical[ly]" denied because Claimant failed to furnish sufficient evidence. (*Id.*)

and 41 years old on the date of the ALJ's decision. (Tr. at 21, 137). He completed high school and one year of college, and communicates in English. (Tr. at 31, 175, 177). Claimant previously worked as construction worker, quality and assurance supervisor for an automotive company, and a sales associate at a tool company. (Tr. at 177).

### III.   Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination,

the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant last met the insured status requirements for disability insurance benefits on December 31, 2010. (Tr. at 15, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity from his alleged onset date of August 1, 2006 through his date last insured ("DLI"). (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the severe impairment of an amputation of the left arm. (Tr. at 15-16, Finding No. 3). The ALJ also considered Claimant's allegations of right carpal tunnel syndrome and epicondylitis; however, the ALJ concluded that these impairments were non-severe because they did not cause a significant limitation in Claimant's ability to perform work-related activities. (Tr. at 15-16).

At the third step, the ALJ determined that Claimant did not have an impairment

or combination of impairments that met or medically equaled any of the impairments
contained in the Listing. (Tr. at 16, Finding No. 4). Specifically, the ALJ found that
Claimant did not meet Listing 1.05, pertaining to amputation. (Tr. at 16). Consequently,
the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20
> C.F.R. 404.1567(b). He is missing his left arm. He can never crawl or climb
> ladders, ropes or scaffolds. He must avoid all exposure to hazards such as
> moving machinery and unprotected heights.

(Tr. at 16-19, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable
to perform his past relevant work through the DLI. (Tr. at 19, Finding No. 6). At the fifth
and final step, the ALJ reviewed Claimant's past work experience, age, and education in
combination with his RFC to determine his ability to engage in substantial gainful activity.
(Tr. at 19-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1972
and was defined as a younger individual on the DLI; (2) he had at least a high school
education and could communicate in English; and (3) transferability of job skills was not
material to the disability determination because the Medical-Vocational Rules supported
a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at
19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a
vocational expert, the ALJ concluded that Claimant could perform jobs that existed in
significant numbers in the national economy, including work as a gate guard, school bus
monitor, and floor plan adjustor at the light exertional level. (Tr. at 19-21, Finding No.
10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social
Security Act at any time between August 1, 2006 through December 31, 2010. (Tr. at 21,
Finding No. 11). Accordingly, Claimant was not entitled to benefits.

## IV.  <u>**Claimant's Challenges to the Commissioner's Decision**</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed "to give retrospective consideration" to medical evidence created after his DLI. (ECF No. 7 at 10). Claimant insists that, although the ALJ acknowledged the existence of evidence related to his carpal tunnel syndrome and epicondylitis created after December 31, 2010, the ALJ disregarded this evidence. (*Id.* at 11). Claimant cites a January 31, 2011 treatment recorded demonstrating right hand pain with a tingling and aching sensation, which had worsened over the previous four to five months. (*Id.*) Claimant also points out that an electromyogram ("EMG") study in February 2011, less than two months after his DLI, revealed mild right median mononeuropathy across his right wrist, consistent with carpal tunnel syndrome. (*Id.* at 11-12). In addition, Claimant asserts that his treating physician recorded positive Tinel's and Phalen's signs as well as right upper extremity joint effusion at an appointment shortly after his DLI. (*Id.* at 12). Claimant contends that this evidence related back to the period before his DLI, yet, the ALJ failed to adequately consider it, particularly when the ALJ found that Claimant's carpal tunnel syndrome and epicondylitis were non-severe impairments at step two. (*Id.* at 10, 12). Furthermore, Claimant asserts that this error was not harmless because the ALJ failed to consider this evidence at subsequent steps in the sequential evaluation. (*Id.* at 13). For example, Claimant avers that the ALJ failed to consider the evidence in determining whether Claimant met the requirements of Listing 1.05, which pertains to amputations. (*Id.* at 14). Similarly, Claimant argues that the ALJ should have considered this evidence and analyzed whether he met Listing 1.02(B), which relates to major joint dysfunction. (*Id.*) Moreover, Claimant insists that the ALJ failed to consider the post-DLI evidence in assessing his RFC and failed to explain why no

limitations for reaching, handling, fingering, or feeling were included in the RFC finding. (*Id.* at 16-18). Within this argument, Claimant asserts that the ALJ failed to adequately consider an opinion offered by Claimant's treating physician, Justin Bailey, M.D., who opined that Claimant's amputated left arm and right carpal tunnel syndrome "left him essentially unable to perform most tasks that require using his arms and hands." (*Id.* at 18).

Second, Claimant contends that the ALJ erred by failing to order an updated medical opinion after additional medical evidence was received that could have altered the opinions of the state agency consultants. (*Id.* at 19). Claimant points out that the ALJ assigned no weight to the state agency medical consultants' opinions that there was insufficient evidence in the file to determine whether Claimant had any severe impairments. (*Id.* at 20). In doing so, the ALJ concluded that there was evidence that Claimant's left arm amputation was a severe impairment. (*Id.*) As such, Claimant asserts that "the record reviewed by the State agency consultants was not the same record available to the ALJ" at the time of the decision. (*Id.*) Because "key" medical evidence was introduced into the record after the consultants offered their opinions, including Dr. Bailey's opinion, which Claimant believes raises a "substantial question as to whether [his] impairments" meet a listed impairment, Claimant insists that the ALJ was required to obtain an updated medical opinion. (*Id.* at 20-21).

In response to Claimant's first challenge, the Commissioner maintains that the ALJ adequately considered the evidence created after Claimant's DLI. (ECF No. 9 at 9). Specifically, the Commissioner asserts that substantial evidence supports the ALJ's step-two finding that Claimant's carpal tunnel syndrome and lateral epicondylitis were non-severe impairments. (*Id.*) The Commissioner argues that, despite the diagnoses of carpal

tunnel syndrome and lateral epicondylitis, there was no evidence that Claimant experienced any functional limitations as a result of these impairments. (*Id.* at 10). The Commissioner emphasizes that the objective findings related to these conditions were mild and that Claimant was able to continue working after his left arm amputation until 2006, when he lost his job. (*Id.* at 10-11). The Commissioner also asserts that Claimant's activities, including "pick[ing] up around the house," driving a car, and grocery shopping, demonstrate that these impairments are not severe. (*Id.*at 11). In addition, the Commissioner contends that any error in finding Claimant's carpal tunnel syndrome and lateral epicondylitis to be non-severe was harmless because the vocational expert testified at the administrative hearing that Claimant could perform the identified jobs even if limited to occasional reaching, handling, fingering, and feeling with his right arm. (*Id.* at 12).

Next, the Commissioner argues that Claimant did not meet or equal the criteria for any listed impairment. (*Id.* at 12). According to the Commissioner, Claimant does not meet Listing 1.05 because only his left hand was amputated and there was no evidence that Claimant was unable to use his right hand. (*Id.* at 13-14). Moreover, the Commissioner insists that the ALJ was not required to consider Listing 1.02(B) "because no possible interpretation of the evidence implicated this listing." (*Id.* at 15). The Commissioner asserts that there was no evidence that Claimant experienced any impairment of a major peripheral joint of his right upper extremity or an extreme loss of function of both extremities. (*Id.*)

The Commissioner also contends that the ALJ's RFC finding is supported by substantial evidence. (*Id.* at 15). The Commissioner argues that "the ALJ made specific findings in regard to the functions where a limitation was found." (*Id.* at 16). As for any

assertion by Claimant that the ALJ failed to properly consider Dr. Bailey's opinion, the Commissioner avers that the ALJ correctly rejected the opinion because the objective medical evidence and Claimant's activities did not corroborate Dr. Bailey's conclusions. (*Id.* at 16-17).

With respect to Claimant's second challenge, the Commissioner responds that the ALJ was not required to obtain an updated medical opinion. (*Id.* at 18). The Commissioner asserts that the ALJ "was not required to obtain an updated medical opinion ... despite the fact that additional records were received into evidence after the state agency physicians had made their review." (*Id.*) The Commissioner points out that Social Security Ruling ("SSR") 96-6p requires an ALJ to obtain an updated medical expert opinion only when additional evidence is received that may change the state agency physician's finding that a claimant's impairment does not meet or equal a listed impairment. (*Id.* at 18-19). According to the Commissioner, because the evidence submitted after the consultants rendered their opinions did not support a finding that Claimant's condition met or equaled a listed impairment, the ALJ was not required to obtain an updated medical opinion. (*Id.* at 19).

## V.   Relevant Medical History

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized below.

### A. Treatment Records

On May 22, 2002, Claimant presented to Charleston Area Medical Center with a forearm injury. (Tr. at 212). While working at a stamping plant, Claimant's left arm was caught in a machine, causing a significant injury. (*Id.*) Claimant was awake, alert, and hemodynamically stable. (*Id.*) However, Claimant had no sensation or motor function in

his left arm, and distal to the laceration was a near amputation of the mid forearm. (*Id.*) Pulses, sensation, and movement was absent distally. (*Id.*) An x-ray of Claimant's left forearm revealed open comminuted fractures of the radius and ulna. (Tr. at 220). An attempt was made to transfer Claimant to a hand surgery center in Louisville, Kentucky; however, transfer was denied. (Tr. at 216). That same day, James Kessel, M.D., performed a completion of traumatic guillotine amputation of the left forearm. (*Id.*) The post-operative diagnosis was traumatic crush injury and amputation to the left proximal third of the forearm. (*Id.*) The following day, Claimant underwent surgery for revision of the left forearm amputation and placement of VAC dressing. (Tr. at 218). Claimant was discharged in stable condition on May 27, 2002 with diagnoses of left upper extremity amputation, traumatic amputation, and status post forearm amputation and revision. (Tr. at 210). While in the hospital, Claimant received consultations for a prosthesis and rehabilitation. (*Id.*) Claimant was advised to follow up with the surgery clinic in one week and the amputation clinic in four weeks. (*Id.*) He was prescribed Tylox and Toradol. (Tr. at 211).

Claimant again visited Charleston Area Medical Center on August 10, 2005 with complaints of phantom pain in his left arm. (Tr. at 233-34). He described the pain as a two out of ten. (Tr. at 233). Claimant also reported tingling in his right hand along with decreased sensation in the third, fourth, and fifth fingers, which began approximately one month prior to his visit. (Tr. at 234). Claimant reported he used his right hand quite a bit since his left arm had been amputated, especially using the computer. (*Id.*) In addition, Claimant indicated that he experienced numbness in his right forearm, which did not radiate above the elbow. (*Id.*) Claimant was assessed with paresthesia of the right upper extremity, and he was referred to an orthopedist for possible carpal tunnel syndrome.

(*Id.*)

On February 24, 2010, Claimant presented to Justin Bailey, M.D., at Mountain State Medical Associates with complaints of pain in his right shoulder, arm, and hand. (Tr. at 264). Claimant stated that the pain was significant and accompanied by a burning sensation. (*Id.*) He also described tingling in his right hand. (*Id.*) A physical examination was normal, other than amputation of the left forearm. (Tr. at 264-65). Claimant was assessed with arm pain/carpal tunnel syndrome/osteoarthritis. (Tr. at 265). A trial period of wearing a wrist splint was prescribed along with Naprosyn. (*Id.*) Dr. Bailey noted that Claimant might eventually need an EMG study or surgical referral. (*Id.*)

On January 5, 2011, Claimant presented to Mountain State Prosthetics for an evaluation of his left transradial prosthesis. (Tr. at 273). Claimant required a prosthetic replacement due to excessive wear and tear as well as anatomical changes. (*Id.*) The socket of the prosthesis had become too large for Claimant. (*Id.*) A recommendation was made for Claimant to obtain a transradial prosthesis of similar design. (*Id.*)

Claimant returned to Mountain State Medical Associates on January 31, 2011. (Tr. at 263). Claimant reported right hand pain that had persisted for the prior six months and worsened over the previous four to five months. (*Id.*) He described the pain as tingling and aching, and he noted that the pain was exacerbated with activity. (*Id.*) Claimant indicated that he used ibuprofen for the pain, which afforded him some relief. (*Id.*) An examination of the extremities showed no joint effusions. (Tr. at 262).[2] Dr. Bailey recorded a positive Tinel's sign and Phalen's sign on the right. (*Id.*) Dr. Bailey questioned

---

[2] This treatment record appears to span two pages; however, it is not entirely clear if both pages relate to January 31, 2011. (Tr. at 262-63). While Claimant has described the medical findings and diagnoses on page 262 of the transcript as relating to May 4, 2011, the most logical way of reading the treatment record is that those findings and diagnoses are from Claimant's January 31, 2011 appointment. (ECF No. 7 at 7, 12).

whether Claimant's symptoms stemmed from osteoarthritis or carpel tunnel syndrome. (*Id.*) He recommended that Claimant continue using ibuprofen and wearing a wrist splint on the right extremity. (*Id.*)

Dr. Bailey referred Claimant to Cabell Huntington Hospital for an EMG study of his right upper extremity, which was performed on February 14, 2011. (Tr. at 245-47). J. Douglas Miles, M.D., Ph.D., found the results to be abnormal and consistent with a mild right median mononeuropathy across the wrist with no active denervation. (Tr. at 246). Dr. Miles observed that the findings were consistent with a clinical diagnosis of carpal tunnel syndrome. (Tr. at 246-47). However, Dr. Miles noted that there was no evidence of any superimposed cervical radiculopathy, brachial plexopathy, or other entrapment mononeuropathy in the right upper extremity. (Tr. at 247).

On November 27, 2012, Claimant presented to Michael Chambers, M.D., and Charles E. Giangarra, M.D., at University Physicians & Surgeons with complaints of right shoulder and elbow pain for the previous five years, which had worsened over time. (Tr. at 252-54). Due to the amputation of his left arm, Claimant was required to use his right arm "a lot more." (Tr. at 253). Claimant also described numbness and tingling in all five fingers. (*Id.*) Claimant stated that he took ibuprofen as needed for his pain. (*Id.*) Upon examination, Claimant's right upper extremity showed positive Neer and Hawkins impingement signs. (*Id.*) Claimant exhibited pain on palpation at the acromion with mild tenderness to palpation over the bicep. (*Id.*) Pain was elicited with stressing the subscapularis. (*Id.*) Claimant's rotator cuff strength in the supraspinatus, infraspinatur, subscapularis, and teres minor was 5/5. (*Id.*) Range of motion measured 5/5 as well. (*Id.*) Claimant was able to forward flex and abduct to 160 degrees, and his radial pulse measured 2+. (*Id.*) Claimant had mild decreased sensation in the median, ulnar nerve

distribution, and he demonstrated a positive Tinel's sign at the wrist and over the cubital tunnel. (*Id.*) A compression test was positive for numbness of the hand. (*Id.*) However, no numbness or tingling symptoms were reproduced with neck motion. (*Id.*) X-rays of Claimant's right shoulder revealed a type 2 acromion; however, no other bony abnormalities or soft tissue masses were observed. (Tr. at 253, 255). Claimant was assessed with right shoulder impingement syndrome, lateral epicondylitis, cubital syndrome, and carpel tunnel syndrome. (Tr. at 253-54). Both physicians recommended a course of prednisone followed by anti-inflammatory medication. (Tr. at 254). They also recommended physical therapy. (*Id.*) In addition, Claimant was provided a counter pressure strap for his lateral epicondylitis and a wrist brace for his carpal tunnel syndrome. (*Id.*) Claimant was advised that he might require surgery for his carpal tunnel and cubital tunnel symptoms. (*Id.*)

On December 4, 2012, Claimant attended physical therapy at the Sports Medicine and Rehabilitation Therapies Center. (Tr. at 256-57). Claimant reported constant lateral right elbow pain, which he believed was caused by chronic over-use of his right arm. (Tr. at 257). Claimant indicated he used anti-inflammatory medications for his pain. (*Id.*) Claimant exhibited full active range of motion and strength in his right upper extremity. (*Id.*) Claimant reported some pain during the examination, and his physical therapist noted tenderness of the lateral epicondyle and biceps. (*Id.*) The physical therapist also recorded a positive impingement sign. (*Id.*) Claimant was assessed with a tight posterior cuff and lateral epicondylitis, and he was instructed to continue therapy two times each week for four to six weeks. (*Id.*)

On January 22, 2013, Claimant returned to University Physicians & Surgeons to be examined by Matthew Wingate, M.D., and Dr. Giangarra. (Tr. at 269-70). Claimant

complained of numbness in the ulnar and median nerve distribution of his right hand. (Tr. at 269). Claimant wore a left arm prosthesis; however, Claimant indicated dissatisfaction with its functionality. (*Id.*) Claimant also reported that he had not obtained the prescription for prednisone; rather, Claimant had been taking nonsteroidal anti-inflammatory medications, which did not relieve his symptoms. (*Id.*) Claimant had attended four physical therapy sessions since his previous appointment, but he informed the doctors that therapy caused significant pain on the lateral aspect of the right elbow and he was unsure whether he wanted to continue. (*Id.*) The treaters noted that Claimant's main problem seemed to involve the lateral epicondylitis, which caused pain and weakness. (*Id.*)

Upon examination, Claimant's right upper extremity exhibited decreased external rotation at 90/90 in his shoulder with reproducible pain. (*Id.*) Claimant's rotator cuff muscle strength measured 5/5 throughout with good internal rotation. (*Id.*) Claimant had pain upon the crossover test. (*Id.*) His right elbow showed significant tenderness to palpation along the lateral condyle where the insertion of the extensor mass is located. (*Id.*) Claimant experienced minimal tenderness to palpation along the medial epicondyle. (*Id.*) Examination of Claimant's right wrist revealed reproducible numbness with positive Tinel's sign and Phalen's sign. (*Id.*) Sensation was grossly intact to light tough in the median, ulnar, and radial nerve distribution throughout the right hand. (*Id.*) Claimant's radial pulse was 2+. (*Id.*) Claimant reported significant pain with forced flexion of the wrist when he attempted to resist the motion. (*Id.*) Claimant was assessed with right shoulder impingement syndrome, lateral epicondylitis, cubital tunnel syndrome, and carpal tunnel syndrome. (*Id.*) The doctors determined that Claimant had not shown much improvement with pain control in the lateral epicondyle area. (*Id.*) They noted that

14

Claimant had not filled his prednisone prescription and had not attended physical therapy as prescribed. (*Id.*) Claimant received an injection of Marcaine, Celestone, and lidocaine to his right elbow. (Tr. at 269-70). The physicians indicated that, if the injection did not afford Claimant relief, then surgical treatment would be considered. (Tr. at 269). With respect to Claimant's shoulder impingement, cubital tunnel syndrome, and carpal tunnel syndrome, the physicians concluded that further evaluation and treatment would be delayed until Claimant's lateral epicondylitis was successfully treated. (*Id.*)

On June 11, 2013, Claimant again visited Dr. Giangarra for problems with right tennis elbow. (Tr. at 268). Claimant reported that the injection provided at his last visit helped for only a few days. (*Id.*) Claimant stated that he tried a tennis elbow strap; however, the strap caused him additional discomfort and neurapraxia in the radial nerve distribution. (*Id.*) Upon examination, Claimant exhibited tenderness over the lateral epicondyle that was aggravated by resisted wrist extension and forearm supination. (*Id.*) Dr. Giangarra observed no instability. (*Id.*) Claimant's motor and sensory examination was normal in all three peripheral nerves, but he reported decreased sensation in the median nerve distribution. (*Id.*) Dr. Giangarra noted a positive Tinel's sign in Claimant's wrist. (*Id.*) Claimant's radial pulses were 2+. (*Id.*) Claimant was assessed with recurrent chronic lateral epicondylitis at the right elbow and carpal tunnel syndrome of the right wrist. (*Id.*) Dr. Giangarra advised Claimant that a platelet rich plasma injection could improve or cure his chronic lateral epicondylitis. (*Id.*) Claimant informed Dr. Giangarra that he wished to discuss the procedure with his attorney in order to understand any consequences of the injection on his worker's compensation case. (*Id.*)

### B. Opinion Evidence

On August 25, 2010, A. Rafael Gomez, M.D., completed a Physical Residual

Functional Capacity Assessment form. (Tr. at 236-43). In the Additional Comments section of the form, Dr. Gomez noted that Claimant alleged carpal tunnel syndrome of the right hand, tendonitis of the right elbow, right shoulder problems, and amputation of his left arm. (Tr. at 243). Dr. Gomez also indicated that Claimant had failed to appear for a consultative examination that was scheduled for July 2, 2010. (*Id.*) Letters were sent to Claimant and a third party with no response. (*Id.*) Ultimately, Dr. Gomez concluded that there was insufficient evidence to complete the assessment given Claimant's lack of cooperation. (*Id.*)

On October 29, 2012, Fulvio Franyutti, M.D., completed a case analysis. (Tr. at 59). Dr. Franyutti concluded that there was insufficient medical evidence to determine Claimant's RFC prior to December 31, 2010, the DLI. (*Id.*)

On March 18, 2014, Dr. Bailey wrote a letter indicating that he had treated Claimant since February 24, 2010. (Tr. at 284). Dr. Bailey stated that Claimant had to use his right arm and hand "almost exclusively for daily functioning" after having his left arm amputated. (*Id.*) As a result, Dr. Bailey indicated that Claimant had developed right arm carpal tunnel syndrome along with pain and numbness in his right hand "now." (*Id.*) Dr. Bailey opined that Claimant's right arm and hand problems "left him essentially unable to perform most tasks that require using his arms and hands." (*Id.*) Dr. Bailey also noted that Claimant reported experiencing significant phantom pain of the left arm, which affected his ability to concentrate. (*Id.*)

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the United States Court of Appeals for the Fourth Circuit defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

### A. Whether the ALJ Failed to Give Retrospective Consideration to Post-DLI Medical Evidence

In his first challenge, Claimant argues that the ALJ failed to give retrospective consideration to the medical evidence created after his DLI in three ways. First, Claimant insists that the ALJ erred in finding that Claimant's carpal tunnel syndrome and epicondylitis were non-severe impairments when evidence created after December 31, 2010 demonstrated that these conditions had more than a minimal effect on his ability to perform work activities during the pertinent time period. (ECF No. 7 at 10-13). Second, Claimant contends that the ALJ failed to properly consider the post-DLI evidence in

analyzing whether Claimant met or equaled a listed impairment at step three. (*Id.* at 13-15). Third, Claimant asserts that the ALJ did not adequately address this evidence in assessing Claimant's RFC. (*Id.* at 16-19).

To begin, "medical evidence post the date last insured may be useful in providing a retrospective insight into the claimant's medical condition prior to the date last insured and must be considered by the Commissioner if linked to the prior medical condition of the claimant." *Foshee v. Colvin*, No. 4:11-2912, 2013 WL 1149927, at *1 (D.S.C. Mar. 19, 2013); *see also Bevans v. Colvin*, No. 3:13-cv-12502, 2014 WL 4925431, at *3 (S.D.W.Va. Sept. 30, 2014) ("[S]everal circuits, including the Fourth Circuit, have concluded that retrospective opinions may well be relevant to disability determinations and should not be disregarded solely on account of their retrospective character."). Indeed, the Fourth Circuit has explained that "medical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987)). When the evidence supports a finding that an evaluation prepared after a claimant's DLI discusses impairments that existed prior to the claimant's DLI, the evaluation should be given retrospective consideration if the "evidence [also] permits an inference of linkage with the claimant's pre-DLI condition." *Id.* at 341 (citing *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). In other words, "[r]etrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* For example, in *Moore*, the Court held that "an SSA examiner improperly failed to give retrospective consideration to evidence created between six and seven years after the claimant's DLI, because the

evidence could be 'reflective of a possible earlier and progressive degeneration.'" *Bird*, 699 F.3d at 341 (quoting *Moore*, 418 F.2d at 1226).

Turning to Claimant's first sub-argument, at the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. *Id.* § 404.1521(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54,

107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin*, No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue*, No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue*, No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W. Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). A number of federal

courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ found that Claimant's right carpal tunnel syndrome and epicondylitis were non-severe because these impairments did not significantly limit Claimant's ability to perform basic work activities. (Tr. at 15-16). In support of his conclusion, the ALJ summarized treatment records from February 2010, February 2011, and November 2012 along with Claimant's testimony at the administrative hearing concerning these conditions. (Tr. at 16). The ALJ noted that Claimant reported right shoulder pain and a tingling sensation in his right hand in February 2010, but a physical examination was unremarkable. (*Id.*) The ALJ acknowledged that Claimant was assessed with arm pain, carpal tunnel syndrome, and osteoarthritis at that visit, and he was prescribed a wrist splint and Naprosyn. (*Id.*) The ALJ also recognized that Claimant underwent an EMG study in February 2011, which revealed mild right median mononeuropathy across the wrist with no active denervation. (*Id.*) These findings were consistent with a clinical diagnosis of carpal tunnel syndrome; however, the EMG study also demonstrated that Claimant experienced no superimposed cervical radiculopathy, brachial plexopathy, or other entrapment mononeuropathy in his right upper extremity. (*Id.*) In addition, the ALJ noted that, nearly two years after Claimant's DLI, he was assessed with right shoulder impingement syndrome, lateral epicondylitis, cubital tunnel syndrome, and carpal tunnel syndrome in November 2012. (*Id.*) As for Claimant's

testimony, the ALJ indicated that Claimant testified he began experiencing tennis elbow in his right arm after his left arm was amputated and that the condition of his right upper extremity worsened over time. (*Id.*) Claimant also described reduced grip strength, constant right hand numbness, and very little strength and endurance in his right upper extremity. (*Id.*) Claimant testified that he could pick up a pen from a table, but he had problems with dropping things and he could not button buttons. (*Id.*) In terms of treatment, Claimant stated that he used ice packs and ibuprofen, with the latter providing some pain relief. (*Id.*)

After thoroughly reviewing the record and the ALJ's written decision, the undersigned **FINDS** that substantial evidence supports the ALJ's conclusion that Claimant's right carpal tunnel syndrome and epicondylitis were non-severe impairments. At the second step of the sequential evaluation, the ALJ discussed medical evidence, including medical findings post-dating Claimant's DLI, that demonstrated Claimant's carpal tunnel syndrome was only mild at the time of the DLI. (Tr. at 16). Specifically, the ALJ noted that a physical examination in February 2010 (the last treatment record created before Claimant's DLI) was normal and that a post-DLI EMG study revealed only mild right median mononeuropathy across Claimant's right wrist. (*Id.*) Although the EMG study results were consistent with a diagnosis of carpal tunnel syndrome, "the mere diagnosis [of carpal tunnel syndrome] does not establish severity." *See Berry v. Colvin*, No. 3:14-cv-9859, 2015 WL 1506128, at *14 (S.D.W.Va. Mar. 31, 2015). The ALJ also recognized that Claimant's carpal tunnel condition was treated conservatively with a wrist splint and Naprosyn. (Tr. at 16). Moreover, the ALJ acknowledged Claimant's testimony at the administrative hearing that Claimant's carpal tunnel condition worsened with time. (*Id.*) Indeed, when chronicling the worsening of this condition, Claimant testified at the

22

March 2014 administrative hearing that he saw "a big difference in [his] grip strength from like here in the past six months then [*sic*] [he] did four or five years ago." (Tr. at 35-36). As such, the ALJ could have reasonably concluded that Claimant's condition deteriorated over the thirty-eight months between the DLI and the time of Claimant's testimony describing the limiting effects of the condition, and rapidly so within the few months before the hearing, which lends support to the ALJ's determination that Claimant's carpal tunnel syndrome was not a severe impairment at the time of the DLI. In relation to Claimant's epicondylitis, the ALJ remarked that Claimant was not diagnosed with that condition until two years after the DLI. (*Id.*) By doing so, the ALJ implicitly highlighted that Claimant appeared to refrain from seeking treatment for any elbow condition close in time to the DLI.

Simply put, there was substantial evidence for the ALJ to conclude that Claimant's right carpal tunnel syndrome and epicondylitis were non-severe impairments at the time of the DLI, and there was insufficient evidence presented by Claimant to substantiate what effect, if any, those conditions had on Claimant's ability to perform basic work activities as of December 2010. Furthermore, the ALJ considered evidence related to those conditions post-dating the DLI. Nonetheless, even giving retrospective consideration to the evidence, the ALJ appropriately found that Claimant's conditions were non-severe at the time of the DLI. To the extent that Claimant faults the ALJ for failing to discuss the findings from Claimant's January 2011 treatment with Dr. Bailey, any error was harmless for at least three reasons. First, although Claimant indicated that his hand pain had worsened for the previous four or five months at the January 2011 appointment, he also reported that ibuprofen provided some relief, and Dr. Bailey offered conservative treatment suggestions, including continuing ibuprofen and using a wrist

23

splint. (Tr. at 262-63). Second, the EMG study performed after January 2011 showed only mild right median mononeuropathy across the right wrist, which supports the ALJ's step two finding. Finally, because the ALJ found that Claimant's left arm amputation was a severe impairment, the sequential evaluation proceeded to the later steps, and as discussed below, Claimant has failed to identify any particular functional limitations that the ALJ should have identified based on the medical records that Claimant alleges the ALJ failed to sufficiently discuss.

Next, Claimant argues that the ALJ erred at step three by failing to find that he met Listing 1.05 and neglecting to consider whether he met Listing 1.02(B), in light of the post-DLI evidence. A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 404.1520(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing grants an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

In order to meet or medically equal Listing 1.05, Claimant must demonstrate amputation of: A. both hands; B. one or both lower extremities at or above the tarsal

24

region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively; C. one hand and one lower extremity at or above the tarsal region, with inability to ambulate effectively; or D. hemipelvectomy or hip disarticulation. 20 C.F.R. § 404, Subpart P, App. 1, ¶ 1.05.

In this case, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medially equaled the severity of a listed impairment. (Tr. at 16). Specifically, the ALJ considered Listing 1.05 by stating its requirements and summarily finding that Claimant's condition did not meet those specifications. (*Id.*) The undersigned **FINDS** that the ALJ's conclusion regarding Listing 1.05 is supported by substantial evidence. Claimant failed to present sufficient evidence that his right upper extremity impairments, which the ALJ appropriately found to be non-severe, when considered in combination, were so limiting that they essentially amounted to a right arm amputation. Indeed, the record belies any such assertion. As the ALJ noted in the written decision, Claimant testified that he still retained use of his right arm, and he was able to drive short distances, perform "minor" household chores, and shop for groceries. (Tr. at 18). Moreover, the medical findings contemporaneous with the DLI do not establish that Claimant's right upper extremity limitations were equivalent to an amputation. Likewise, none of the other subparts of Listing 1.05 applied to Claimant.

Claimant also asserts that the ALJ should have considered whether he met or equaled the specifications of Listing 1.02(B), which requires:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

....

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § 404, Subpart P, App. 1, ¶ 1.02. The Listing defines "inability to perform fine and gross movements effectively" as follows:

c. What we mean by inability to perform fine and gross movements effectively. Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

*Id.* ¶ 1.00(B)(2)(c).

"An ALJ has a duty to identify the relevant listed impairments and compare each of the listed criteria to the evidence of the claimant's symptoms." *Shaver v. Colvin*, No. 5:13-cv-133, 2014 WL 1047109, at *15 (S.D.W.Va. Mar. 18, 2014). "This rule however, is not inflexible requiring discussion of each listing, point-by-point. The duty of explanation is said to be triggered when 'there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments.'" *Id.* (quoting *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 645 (D. Md. 1999)).

Here, the ALJ properly refrained from discussing whether Claimant met Listing 1.02(B). Assuming *arguendo* that Listing 1.02(B) applies to persons who have undergone an amputation of an upper extremity, Claimant failed to present ample evidence to trigger the ALJ's duty to consider Listing 1.02(B). For instance, Claimant did not present

evidence relevant to the DLI of "gross anatomical deformity" of a joint in his right upper extremity. *See Johnson v. Comm'r, Soc. Sec. Admin.*, No. 14-1370, 2015 WL 7254188, at *2 (D. Md. Nov. 17, 2015) (concluding claimant's carpal tunnel syndrome did not meet Listing 1.02(B) where claimant failed to produce evidence of "gross anatomical deformity" of a joint). Claimant likewise failed to offer objective evidence regarding limitation of motion; to the contrary, the few range of motion tests in Claimant's file generally demonstrate normal range of motion of the right upper extremity. (Tr. at 253, 257). Also, it is at least debatable whether Claimant provided any "medically acceptable imaging" findings showing "joint space narrowing, bony destruction, or ankylosis." "Medically acceptable imaging includes, but is not limited to, x-ray imaging, computerized axial tomography (CAT scan) or magnetic resonance imaging (MRI), with or without contrast material, myelography, and radionuclear bone scans." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 1.00(C)(1). Although Claimant presented EMG study results showing mild right median mononeuropathy across his right wrist, it is unclear whether this evidence satisfies the requirement of "medically acceptable imaging" showing "joint space narrowing." However, the undersigned need not resolve that particular issued since, in this proceeding, Claimant has entirely failed to explain how he meets the requirements of the introductory paragraph of Listing 1.02.[3]

In essence, Claimant only argues that he meets the conditions contained in paragraph B, and in support of his position, he cites his testimony at the March 2014 administrative hearing concerning his right arm functional limitations. (ECF No. 7 at 14-15). However, Claimant did not testify regarding his limitations at the time of the DLI,

---

[3] Because Claimant has failed to provide any explanation in this regard, any error by the ALJ may qualify as harmless. *See Anderson v. Colvin*, No. 13-C-788, 2014 WL 5430275, at *29 (E.D. Wis. Oct. 25, 2014).

and, in any event, his testimony alone was insufficient to establish that he met or equaled the requirements of Listing 1.02(B). *See* 20 C.F.R. § 404.1529(d)(3) (stating that the SSA "will not substitute your allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed impairment."); *Backman v. Colvin*, No. 4:12-cv-1897, 2014 WL 798356, at *6 (D.S.C. Feb. 27, 2014). Accordingly, the undersigned **FINDS** that the ALJ properly declined to consider whether Claimant met or equaled Listing 1.02(B).

In his final argument on this subject, Claimant alleges that the ALJ erred in formulating his RFC. Claimant asserts that the ALJ neglected to consider the impact of both his severe and non-severe impairments in assessing his RFC. Claimant contends that the ALJ's RFC discussion failed to address evidence that was contrary to the ALJ's findings and that the ALJ failed to give appropriate weight to Dr. Bailey's opinion. Claimant also argues that the ALJ failed to explain in the RFC discussion "what effect, if any," the amputation of Claimant's left arm would have on his ability to lift, carry, reach, handle, finger, or feel. (ECF No. 7 at 17).

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's

28

ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ concluded that Claimant retained the ability to perform light work, (Tr. at 16), which requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). "[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* The ALJ added to the RFC finding that Claimant was missing his left arm, he could "never

crawl or climb ladders, ropes, or scaffolds," and he "must avoid all exposure to hazards such as moving machinery or unprotected heights." (Tr. at 16-17).

In assessing Claimant's RFC, the ALJ acknowledged that Claimant testified he had difficulty opening jars, putting toothpaste on a toothbrush, and tying his shoes after losing his left arm. (Tr. at 17). However, the ALJ recognized that Claimant was able to drive short distances, perform "minor" household chores, and shop for groceries. (Tr. at 18). The ALJ also emphasized that Claimant was able to work for several years after his left arm amputation and that he continued to look for work after being let go by his employer in 2006. (Tr. at 17-18). The ALJ found that Claimant's attempt to find other work in 2006 contradicted his assertion that he was disabled since his alleged onset date of August 1, 2006. (Tr. at 18).

Turning to the opinion evidence, the ALJ indicated that the state agency medical consultants had opined that there was insufficient evidence to establish that Claimant suffered from a severe impairment. (*Id.*) The ALJ assigned these opinions no weight, concluding that Claimant's amputation "reasonably result[ed] in the limitations" contained in the RFC. (*Id.*) The ALJ also recognized that Dr. Bailey offered an opinion in March 2014 that Claimant had developed carpal tunnel syndrome with right hand pain and numbness as a result of the exclusive use of his right arm to perform daily tasks since 2002. (*Id.*) The ALJ acknowledged Dr. Bailey's assertion that Claimant was "essentially unable to perform most tasks that require using his arms and hands." (*Id.*) In addition, the ALJ summarized Dr. Bailey's opinion that Claimant's phantom pain in his left arm diminished his ability to concentrate. (*Id.*) The ALJ assigned "little weight" to Dr. Bailey's opinion because Dr. Bailey failed to cite medical evidence to support his opinion and Claimant testified that his phantom pain had improved. (*Id.*) Ultimately, the ALJ

concluded that "the evidence of record support[ed] a finding that [Claimant] can function in a competitive work environment, factoring in the functional limitations provided in the [RFC] to accommodate his severe and nonsevere impairments." (*Id.*)

As indicated above, Claimant contends that there are several errors in the ALJ's RFC discussion. Specifically, Claimant argues that the ALJ failed to take into account both his severe and non-severe impairments in formulating his RFC. However, Claimant has failed to identify any specific limitations with respect to his right upper extremity that should have been included in the RFC finding or those medical findings relevant to the DLI that support such limitations. While Claimant relies on Dr. Bailey's opinion to establish that he is essentially unable to use his right upper extremity, there is no indication that Dr. Bailey's opinion is retroactively applicable to Claimant's DLI. In fact, Dr. Bailey stated in his March 2014 letter that Claimant "has developed a carpal tunnel syndrome and subsequent pain and numbness in his right hand *now*." (Tr. at 284) (emphasis added). Although Dr. Bailey's use of the word "now" is not dispositive evidence of the retroactivity of his opinion, it certainly undermines Claimant's argument that Dr. Bailey's opinion describes Claimant's functional limitations as of December 31, 2010. Moreover, the ALJ aptly noted that Dr. Bailey had failed to cite objective findings to substantiate his opinion; obviously then, Dr. Bailey did not cite findings relevant to the DLI that corroborated his conclusions. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *see Donald v. Comm'r of Soc. Sec.*, No. 13-11845, 2014 WL 3729177, at *3 n.2 (E.D. Mich. May 27, 2014). In contrast, the ALJ discussed record evidence throughout the written

31

decision that was relevant to the DLI and contradictory to an opinion by Dr. Bailey that Claimant was virtually incapable of using his right arm between August 2006 and December 2010. Because Claimant has failed to identify any particular limitations that would have existed at the time of the DLI that were left out of the RFC finding, and there is no indication that Dr. Bailey's opinion regarding the functional limitation of Claimant's right upper extremity was retroactively applicable to December 2010, these challenges to the RFC discussion are unconvincing.

Claimant also argues that the ALJ failed to discuss record evidence that contradicted the RFC finding. Assuming *arguendo* that the ALJ should have more thoroughly discussed particular evidence concerning Claimant's right upper extremity impairments, the undersigned **FINDS** that any error committed by the ALJ was harmless. Again, Claimant has failed to identify any right upper extremity functional limitations that should have been identified by the ALJ as a result of this purportedly contradictory evidence. *See Anderson v. Colvin*, No. 13-C-788, 2014 WL 5430275, at *31 (E.D. Wis. Oct. 25, 2014) ("Given the paucity of evidence supporting further restrictions, the ALJ's failure to further discuss carpal tunnel syndrome in determining RFC was harmless."). Regardless, in response to the ALJ's controlling hypothetical question, the vocational expert testified that Claimant could perform the jobs of gate guard, school bus monitor, and floor plan adjuster at the light exertional level. (Tr. at 44-45). Upon further questioning, the vocational expert indicated that the job of school bus monitor did not require the use of either upper extremity. (Tr. at 46). The vocational expert stated that there were 110,000 school bus monitor jobs nationally and 1500 school bus monitor jobs regionally. (Tr. at 45). Accordingly, even if the ALJ's RFC finding restricted Claimant to seldom or almost no use of his right upper extremity, there was still a job that existed in

32

significant numbers in the national economy that Claimant could perform.[4] *See Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (stating, in *dicta*, that 110 jobs in a given region may constitute a significant number of jobs); *see also Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013) (recognizing *Hicks* found 110 jobs in claimant's state to be significant number of jobs); *Hodges v. Apfel*, 203 F.3d 820, 2000 WL 121251, at *1 (4th Cir. Jan. 28, 2000) (unpublished table decision) (finding 153 jobs in region was significant number); *Hyatt v. Apfel*, 153 F.3d 720, 1998 WL 480722, at *3 (4th Cir. Aug. 6, 1998) (unpublished table decision) ("We previously have found that as few as 110 jobs constitute a significant number."); *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (finding that 200 jobs in region was a significant number of jobs); *Kennerly v. Colvin*, No. 2:15-cv-1540, 2015 WL 9672913, at *13 (S.D.W.Va. Dec. 8, 2015) ("[I]dentification of even one occupation appropriate for Claimant fulfills the Commissioner's burden at the fifth step of the process, so long as the occupation is available in significant numbers in the economy."), *report and recommendation adopted by* 2016 WL 93867 (S.D.W.Va. Jan. 7, 2016); *Hensley v. Colvin*, No. 5:13-CV-27810, 2015 WL 566626, at *19 (S.D.W.Va. Feb. 10, 2015) ("The Fourth Circuit has recognized that 110 jobs in a given region may constitute a significant number of jobs as required by the regulations."). Consequently, any error by the ALJ in this respect does not require reversal. *See Tamayo v. Colvin*, No. 12-8484, 2013 WL 5651420, at *1 (C.D. Cal. Oct. 11, 2013) (finding ALJ's error in determining claimant could occasionally engage in fine manipulation with right arm was

---

[4] The vocational expert also testified that the jobs of gate guard and floor plan adjuster only required occasional use of an upper extremity. (Tr. at 46). In addition, the vocational expert indicated that, if Claimant were restricted to occasionally reaching, handling, fingering, and feeling with his right arm and never lifting more than ten pounds, then he could perform the work of "a call out operator or [a] non-emergency dispatcher or a referral clerk" at the sedentary level. (Tr. at 46-47). While the ALJ did not identify the number of those sedentary positions available in the national economy, Claimant has not argued that the number would not constitute a significant number for purposes of the Regulations.

harmless where vocational expert identified job that required no use of right arm).

Finally, insofar as Claimant asserts that the ALJ failed to articulate how Claimant's left arm amputation would impact his ability to perform work-related activities, Claimant has not suggested any limitations that he believes the ALJ failed to include in the RFC finding related to this impairment. Indeed, the ALJ included Claimant's loss of his left arm in the RFC finding and the controlling hypothetical question posed to the vocational expert. (Tr. at 16, 44). The ALJ did not need to further describe the functional limitations caused by the amputation of Claimant's left arm—one would understand that Claimant could no longer lift, carry, reach, handle, finger, or feel using his left arm. While the amputation of Claimant's left arm undoubtedly causes him frustration and functional limitation, the ALJ's written decision reflects that Claimant was able to perform work as of December 31, 2010.

### B. Whether the ALJ Erred by Failing to Obtain an Updated Medical Opinion

In his second challenge, Claimant argues that the ALJ erred by failing to obtain an updated medical opinion regarding whether Claimant met or equaled a listed impairment. On the subject of requesting an updated medical opinion, SSR 96–6p states that an ALJ "must obtain an updated medical opinion from a medical expert" in two circumstances: (1) "When no additional medical evidence is received, but in the opinion of the administrative law judge ... the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable," or (2) "[w]hen additional medical evidence is received that in the opinion of the administrative law judge ... may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of

Impairments." 1996 WL 374180, at *3-*4. The decision whether to obtain an updated medical opinion is left to the ALJ's discretion. *Flesher v. Colvin*, No. 2:14-cv-30661, 2016 WL 1271511, at *5 (S.D.W.Va. Mar. 31, 2016). "Although the regulations provide that an ALJ is never bound by a state agency consultant's findings and that the ultimate responsibility for determining step three equivalence rests with the administrative law judge or Appeals Council, it is nonetheless the longstanding policy of the SSA that the judgment of a physician ... designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge must be received into the record as expert opinion evidence and given appropriate weight." *Id.* at *4 (citation and markings omitted).

In this case, Dr. Gomez concluded that there was insufficient evidence to complete a physical RFC assessment given Claimant's lack of cooperation, and Dr. Franyutti opined that there was insufficient medical evidence to determine Claimant's RFC prior to December 31, 2010. (Tr. at 59, 243). Naturally then, neither medical consultant opined that Claimant's impairments met or equaled a listed impairment. Claimant asserts that "key medical evidence" was added to the file after Dr. Franyutti arrived at his opinion, which required the ALJ to seek an updated medical opinion. (ECF No. 7 at 20). Other than Dr. Bailey's opinion letter, Claimant has failed to specifically identify the "key" evidence that Dr. Franyutti did not possess in considering Claimant's file. At the time that Dr. Franyutti rendered his opinion in October 2012, the file contained medical records from Charleston Area Medical Center, Mountain State Medical Associates, and University Neuroscience. (Tr. at 58-59). Even with this evidence, Dr. Franyutti never found that Claimant's impairments met or equaled a listed impairment. As for Dr. Bailey's opinion letter, the ALJ could have reasonably concluded that the letter was not retroactively

applicable to Claimant's DLI, and therefore, the letter would not have changed Dr. Franyutti's opinion. Furthermore, for the reasons mentioned in the Listing discussion above, the evidence submitted after Dr. Franyutti rendered his opinion likely would not have caused Dr. Franyutti to opine that Claimant met or equaled a listed impairment as of December 31, 2010. Overall, the undersigned **FINDS** that the ALJ properly exercised his discretion in determining that the later submitted evidence did not require him to seek an updated medical opinion regarding whether Claimant's impairments met or equaled a listed impairment. *See Flesher*, 2016 WL 1271511, at *6; *Kandel v. Astrue*, No. 1:09-CV-31, 2009 WL 6326810, at *17 (N.D.W. Va. Nov. 4, 2009), *report and recommendation adopted by* 2010 WL 1369080 (N.D.W. Va. Mar. 31, 2010).

## VIII.  <u>**Recommendations for Disposition**</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 7), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 9), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 27, 2016

_____
Cheryl A. Eifert
United States Magistrate Judge